FILED_____ ENTERED
LOGGED_____ RECEIVED

AUG 0 7 2017

IN THE UNITED STATES DISTRICT COURT
FOR MARYLAND

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF APPLE IPHONE 7 PLUS, CURRENTLY LOCATED AT 40 S. GAY STREET, BALTIMORE, MD | **17 - 1 9 6 7 - ADC** <br> Case No. _____ |

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, James Jenkins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a search warrant authorizing the examination of property—an
electronic device—which is currently in law enforcement possession, and the extraction from
that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the U.S. Department of State, Diplomatic Security
Service (DSS), and have been employed by the Department of State since September 2011.  I am
presently assigned to the Document and Benefit Fraud Task Force in Baltimore, MD.  This squad
investigates document fraud, benefit fraud, passport fraud, and visa fraud.  I am empowered
under 22 U.S.C. § 2709 to apply for and serve federal arrest and search warrants.

3.      The facts set forth in this affidavit are known to me as a result of my participation
in this investigation, from information provided to me by other law enforcement officers and
government officials, and from documents, records, and other evidence obtained during this

investigation. Since this affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and it does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is an Apple iPhone 7 plus, International Mobile Equipment Identity (IMEI) 355374089356489, hereinafter the "Device." The Device is currently at Homeland Security Investigations (HSI) Baltimore located at 40 South Gay Street, Baltimore, MD.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371 (conspiracy), 8 U.S.C. § 1325(c) (Marriage Fraud), and 18 U.S.C. § 1546 (Fraud and Misuse of Visas, Permits, and other Documents) (collectively referred to as the "Target Offenses") have been committed by Mohan THAPA and others. There is also probable cause to conduct a forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      On or about May 9, 2014, Jermey JONES executed an application for a U.S. passport application at the Washington Passport Agency (WPA). JONES's application was forwarded to the fraud office and subsequently to DSS. On or about May 13, 2014, JONES was asked to come in for questioning. During this interview JONES stated that he was traveling to Nepal and showed a DSS special agent an email from Nepal2USA@yahoo.com showing that JONES, Tracey GLOVER, and Abigail ROBERTS were to travel to Nepal together with a departure date of May 11, 2014. JONES identified the person paying for his travel as Mohan.

2

JONES said that he did not know Mohan's last name; however, a DSS Special Agent saw on JONES's phone that Mohan was listed under the last name THAPA. In a subsequent interview with DSS Special Agents JONES stated that he paid for the trip himself.

7.    On or about July 9, 2014, DSS special agents interviewed Abigail ROBERTS, one of the individual listed in the email JONES showed agents. ROBERTS said that THAPA offered to pay for her ticket to Nepal. ROBERTS stated that THAPA subsequently asked her to marry someone while she was in Nepal. ROBERTS declined to do so and decided not to go on the trip. According to ROBERTS, THAPA told her he had already purchased the airfare and hotel room.

8.    On or about July 15, 2014, a DSS special agent and analyst spoke with employees of Aero Nepal, a travel agency in Fairfax, VA. A travel agency employee named Ishwari SHRESTHA told the agent that Aero Nepal most recently helped THAPA with tickets to Nepal on May 11, 2014. SHRESTHA said that the last time he traveled THAPA purchased tickets for Tracy GLOVER, Jeromy JONES, Tenisha MULLEN, and Abigail ROBERTS in addition to THAPA himself. According to SHRESHTHA, JONES and MULLEN did not travel due to passport issues. SHRESTHA told agents that all business was done over phone and email and provided THAPA's email as Nepal2USA@yahoo.com and his phone number as 443-572-9972.

9.    On or about October 8, 2014, DSS special agents interviewed Stephen BRAUN, another individual associated with this case, who said that THAPA paid for him to go to Nepal. According to BRAUN, sometime after arriving in Nepal, THAPA approached him with the idea of marrying Ganga GURUNG, a Nepalese national. BRAUN subsequently married her while he was in Nepal. Department of State records show that GURUNG subsequently received a visa to

3

travel to the U.S. According to BRAUN, THAPA gave him instructions and directed the marriage process, including the immigration process after their arrival back in the United States.

10.     On or about July 7, 2016, a DSS SA and others interviewed Tracey GLOVER. GLOVER said that she traveled to Nepal in 2014. The trip was arranged by THAPA who she paid about $2,400 to arrange the trip. According to GLOVER, she married Nirmal KARMACHARYA while in Nepal. GLOVER said that she did not intend to stay married to KARMACHARYA and the marriage was so KARMACHARYA could obtain a U.S. visa. GLOVER said that THAPA first raised the idea of marrying KARMACHARYA to GLOVER prior to the trip. GLOVER said that THAPA promised to pay her once KARMACHARYA received a visa for the U.S. KARMACHARYA did not receive a visa and GLOVER was not paid by THAPA other than returning some of the money she gave him for the trip.

11.     On or about February 3, 2017, Catia MOORE, another individual associated with this investigation, was interviewed. MOORE said that THAPA introduced her to Dil GURUNG and told her that he needed legal U.S. immigration status. MOORE married GURUNG in January 2012. She confirmed that both she and Dil GURUNG knew the marriage was for his immigration status only. MOORE said that THAPA was present at the marriage ceremony and arranged things like the rings and paperwork. MOORE said that THAPA also served as their translator during their interview with U.S. Citizenship and Immigration Services (USCIS).

12.     On May 31, 2017, in the U.S. District Court for the District of Maryland, a federal Grand Jury indicted THAPA on three counts of marriage fraud conspiracy, in violation of 18 U.S.C. § 371, and one count of marriage fraud, in violation of 8 U.S.C. § 1325(c).  A U.S.

4

Magistrate Judge also signed an order authorizing the issuance of an arrest warrant for THAPA that day.

*Phone calls to co-conspirators*

13.    On June 30, 2017, a Department of State Investigative Analyst tabulated information based on records obtained for phone number 443-572-9972. The records show that 443-572-9972 placed calls and/or sent texts to the following numbers associated with individuals involved in the Target Offenses:

| Name associated with number through investigation | Dialed/texted number | Date range | Frequency |
|---|---|---|---|
| Stephen Braun | 540-236-8362 | 04/07/2015- 10/03/2015 | 11 times |
| Tracey Glover | 443-400-3247 | 05/10/2015 – 12/13/2015 | 13 times |
| Catia Moore | 240-354-0249 | 02/18/2015 – 09/18/2015 | 27 times |
| Dil Gurung | 443-768-0509 | 07/25/2015 – 02/10/2016 | 42 times |
| Ganga Gurung | 571-253-0761 | 04/03/2015 – | 284 times |

| | | 09/04/2015 | |
|---|---|---|---|
| | | | |

14.     On or about April 12, 2017, Verizon Wireless responded to an HSI administrative subpoena for subscriber information associated with 443-572-9972. According to Verizon Wireless the phone is registered to THAPA.  The phone was activated on January 22, 2013, it was deactivated on November 17, 2015, and reactivated December 2, 2015.

15.     On or about June 6, 2017, agents executed a search warrant at 7524 Philadelphia Ave, Rosedale, MD.  During the search, agents found a receipt from Verizon which says "Thank you Mohan" at the top and is dated 02/10/2017 at the bottom. According to the receipt the telephone number 443-572-9972 was transferred to an Apple iPhone 7 Plus. The "DEVID" is listed as 355374089356489. I learned from a HSI computer forensics agent that the Device this warrant seeks authorization to examine has an IMEI 355374089356489. Based on internet searches and consultation with a DSS forensics agent I know that mobile devices are issued an IMEI which is unique to a particular phone.  Additionally, the IMEI 355374089356489 is visible on the Device's SIM card tray. Based on this, I believe the Device is or was at some time associated to the telephone number 443-572-9972.

*Emails to co-conspirators*

16.     On October 25, 2016, U.S. Magistrate Judge Beth P. Gesner authorized search warrants for several email accounts including the email address Nepal2USA@yahoo.com which is associated to THAPA. The time period for the search was January 2012 to the present.

17.     I reviewed emails contained in the Nepal2USA@yahoo.com search warrant returns. Among them was an email exchange between THAPA and attorney Rick MOORE. According to information contained in Dil GURUNG's file with USCIS, Richard MOORE is the attorney for Dil GURUNG's immigration filings. In an email exchange on or about September 3, 2013, Rick MOORE wrote to THAPA: "Uscis thinks Dil and Catia's marriage is fraudulent. We need to file a response by Sept 22. This will require a lot of work to address. there is a general lack of paper evidence and he did a lousy job at the interview. If you want me to help them prepare a response I will need $1200 it is Catia's petition so she needs to be the one to officially respond. Rick" On or about September 3, 2013, THAPA responded "Mr Rick Please go head and help out. As Dil and Catia have much time. I will ask Dil to pay you. ASAP. Thank you for your help. Thapa" The last line of THAPA's response reads "Sent from my iPhone".

18.     I reviewed an email chain with the subject line "IRS 2012 Return". This email chain shows that on or about January 22, 2014, BRAUN wrote to THAPA: "She can print this there.Steve". On or about January 23, 2014, THAPA responded "Hi Steve I'm sorry I have been really sick I'm just getting up now. Anyway can u [sic] email her she can print and take it to Embassy". BRAUN responded on or about January 30, 2014, "I sent email to Ganga today." According to Department of State records, Ganga GURUNG was interviewed at the U.S. Embassy in Kathmandu, Nepal on February 4, 2014. Both of THAPA's responses to BRAUN read "Sent from my iPhone" at the bottom.

19.     I reviewed another email from THAPA to allwritenowdotnet@gmail.com, an account associated with BRAUN. In the email THAPA wrote on or about December 26, 2015: "Steve would you please call me. 443-572-9972. Warm Regards Mohan Thapa". The last line reads "Sent from my iPhone".

7

*THAPA's use of text messaging*

20.     Based on the investigation to date, I believe that THAPA uses text messaging as a general means of communication.

21.     On or about June 30, 2017, I reviewed data obtained from a border search of a wireless telephone that was in THAPA's possession on or about October 27, 2016 when he entered the U.S. via Dulles airport. The phone searched on that day was a different wireless telephone from the Device this affidavit requests permission to search. Among other things, the phone from the border search contained approximately 350 incoming or outgoing text messages from April 10, 2015 to October 26, 2016. One text message sent to phone number "+9779851022380" said in part "And my phone number is 443-572-9972." Two outgoing text messages sent on October 28, 2015 and August 16, 2016 include the text "This is Mohan Thapa" suggesting that THAPA was the sending the text messages from this phone.

22.     I also reviewed returns from Facebook produced as a result of a search warrants authorized on December 4, 2015 by U.S. Magistrate Judge J. Mark Coulson and on June 7, 2016 by U.S. Magistrate Judge Beth P. Gesner. Specifically, I reviewed an account that Facebook records show is registered to Mohan THAPA and is associated to the phone number 443-572-9972. Among the messages is one from THAPA to an individual identified as Amrit Jung THAPA in which THAPA wrote on March 25, 2015 at 14:25:18 UTC "I am not busy you can call me when you can text me or email me".

*Conclusion*

23.     Based on the information gathered during the investigation and presented in this affidavit, I believe that THAPA used the phone number that is or was associated with the Device to communicate with individuals associated with this investigation and to make arrangements in furtherance of his criminal activities. Therefore I request that a search warrant be issued for the Device.

## STATUS OF THE DEVICE

24.     The Device is currently in the possession of the HSI Baltimore located 40 South Gay Street, Baltimore, MD.  It came into HSI's possession in the following way:  when THAPA was arrested on June 6, 2017 at 5931 St. Mary's Street, Gwynn Oak, MD there were three wireless telephones in plain view in the room where THAPA was arrested. An HSI computer forensics agent asked THAPA which phone was his.  At this time, THAPA was under arrest pursuant to an arrest warrant and Miranda warnings had not yet been given. THAPA indicated a phone on a bedside table. I asked THAPA if he minded if agents looked at his phone. I do not recall THAPA's exact response but I understood his response to indicate consent. The same HSI computer forensics agent asked THAPA for the wireless phone password which THAPA provided. The agent took possession of the wireless phone and confirmed the password was accurate. After administering a Miranda warning, I asked THAPA for written consent to search the phone. THAPA declined to provide consent. Another HSI agent obtained written consent to search the premises where THAPA was arrested from Hang YANG, the owner and occupant of the premises. This agent said that YANG was cooperative and assisted in identifying THAPA's property during the consent search of the premises. I believe that had THAPA not identified his

phone, agents could have obtained the same information from YANG. Following departure from the arrest location, agents determined that THAPA's cellular phone had been inadvertently left at the site. Two HSI agents returned to 5931 St. Mary's St. and YANG gave the phone to one of them.

25.     Based on my consultation with an HSI computer forensics agent, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of HSI.

26.     An HSI computer forensics agent told me and another agent that he produced a forensic image (copy) of the data contained on the Device on June 16, 2017. The agent told me he did this on his belief that consent existed to search the Device. He also told me that he did this to preserve evidence on the Device. The agent further advised that the information contained on the image has not been reviewed by anyone and stated that the imaging of the device and review of the image are done on different programs. He stated that in addition to producing the image of the Device, he reviewed the "about" information on the Device itself. From this page he obtained information about the phone such the IMEI for the Device previously referenced in this affidavit[1], the Device's serial number, and the operating system version. The agent advised that he needed to know the Apple "iOS" (operating system) version to determine whether the device could be imaged. The agent was able to access the device to complete the above steps using the

---

[1] I reviewed the Apple website at https://support.apple.com/en-us/HT204073, and learned that for the iPhone 7 Plus the IMEI is also printed on the tray of that holds the SIM card. The above referenced HSI forensics agent confirmed this was true of the Device and sent me a photograph of the Device's SIM card tray. The SIM card tray on the Device reads "IMEI 355374089356489".

password to the Device that THAPA provided. This forensic image is in HSI custody and has not been reviewed by any agent. This search warrant seeks authorization to create a new second forensic image to review. The first forensic image will be preserved but will not be reviewed.

## TECHNICAL TERMS

27.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

13

28.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone-7/specs/, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

     a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

     b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

14

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

15

17 - 1 9 6 7 - ADC

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

Respectfully submitted,

James Jenkins
Special Agent
U.S. Department of State
Diplomatic Security Service

Subscribed and sworn to before me
on July 14, 2017:

A. David Copperthite
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

The property to be searched is an Apple iPhone 7 plus, International Mobile Equipment Identity (IMEI) 355374089356489, hereinafter the "Device." The Device is currently at Homeland Security Investigations (HSI) Baltimore located at 40 South Gay Street, Baltimore, MD.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B. This forensic examination will first consist of creating a new forensic image. Any previously created forensic image will not be reviewed.

## ATTACHMENT B

1.      Any and all records on the Device described in Attachment A or its SIM card that relate to violations of 18 U.S.C. § 371, 8 U.S.C. § 1325(c), and 18 U.S.C. § 1546 and involve Mohan THAPA, including:

      a.  All telephone numbers and direct connect numbers of identities assigned to the device, including usernames and passwords and electronic mail addresses;

      b.  Call and direct connect history information including Internet Protocol addresses accessed by the device or accessing the device;

      c.  Stored photographs, videos and text messages;

      d.  Stored electronic mail, including attachments, and voice messages and other recordings;

      e.  Stored calendar records;

      f.  Web-browsing history and any stored web pages;

      g.  Stored documents and other files;

      h.  Stored geo-location information;

      i.  Data stored in any application;

      j.  Any and all contacts and associated telephone numbers.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

3.    Evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

4.    Evidence of the lack of such malicious software;

5.    Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

6.    Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Device;

7.    Evidence of the times the Device was used;

8.    Passwords, encryption keys, and other access devices that may be necessary to access the Device;

9.    Documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

10.    Contextual information necessary to understand the evidence described in this attachment.

11.    With respect to the search of any of the items described above which are stored on the Device described in Attachment A or its SIM card, the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other

2

procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a.    surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c.    "scanning" storage areas to discover and possible recover recently deleted files;

    d.    "scanning" storage areas for deliberately hidden files; or

    e.    performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

12.    If after performing these procedures, the directories, files or storage areas do not reveal evidence that relates to violations of 18 U.S.C. § 371, 8 U.S.C. § 1325(c), and 18 U.S.C. § 1546 or the items described further in this Attachment B, the further search of that particular directory, file or storage area, shall cease.